# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1054-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

K.D.B.,

    Defendant-Appellant,

and

W.M., Deceased,

    Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.M.B.,

    a Minor.

_____

Submitted August 27, 2019 – Decided September 5, 2019

Before Judges Gilson and Mawla.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FG-11-0040-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Steven Edward Miklosey, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Jack Edwin Potash, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (James Dey Harris, Designated Counsel, on the brief).

PER CURIAM

K.D.B. (Kelly) appeals from an October 17, 2018 judgment terminating her parental rights to her minor daughter D.M.B. (Diana), and granting the Division of Child Protection and Permanency (Division) guardianship of the child, with the plan that the child be adopted.[1] Kelly argues that the Division failed to prove prongs two, three, and four of the best-interests test necessary for the termination of parental rights. N.J.S.A. 30:4C-15.1(a). The Division and the child's law guardian urge that we affirm the judgment and allow the adoption

---

[1] We use initials and fictitious names for the parents and children to protect their privacy and the confidentiality of the record. See R. 1:38-3(d)(12).

to proceed. Having reviewed the record in light of the parties' contentions and the applicable law, we affirm substantially for the reasons explained by Judge Wayne J. Forrest in his thorough, sixty-one-page written opinion, dated October 16, 2018.

The facts and evidence were detailed in Judge Forrest's opinion, which he rendered after a four-day trial. Accordingly, we need only summarize some of the facts. Kelly and W.M. (Warren) are the biological parents of Diana, who was born in December 2008. Warren passed away in December 2016, and, therefore, was not the subject of the judgment terminating parental rights.

Kelly has a history of issues involving mental health, instability, and homelessness. The Division first became involved with Kelly and Diana in 2012, when the mother and child relocated from Georgia to New Jersey. Kelly was not able to secure a stable place to live for her and Diana. Consequently, the Division removed Diana from Kelly's care for several weeks in 2012. During that time, Kelly reported to the Division that she had past mental health issues, had been prescribed medication for those issues, but she had not taken her medications for the past three years.

Accordingly, the Division arranged a psychological evaluation for Kelly in June 2012. The psychologist, Gregory C. Gambone, Ph.D., opined that Kelly

was not able to parent Diana independently because she lacked a stable residence, had substance abuse issues, and was not addressing her mental health needs. He recommended that Kelly undergo a psychiatric evaluation, a substance abuse evaluation, substance abuse treatment, parenting training, and psychotherapy. Therefore, the Division referred Kelly to Catholic Charities Family Growth, where she attended services from December 2012 until June 2013.

The Division again became involved with Kelly and Diana in October 2015, when Kelly made a referral concerning an incident she had with her brother. Kelly reported that her brother had pushed her out of his moving vehicle. Kelly also reported that she had been diagnosed with post-traumatic stress disorder (PTSD) resulting from abuse she suffered as a child, but she was off the medications that she had been prescribed.

In 2015, the Division arranged for Kelly to undergo a psychological evaluation with Dr. Sally Morcos. Dr. Morcos reported that Kelly had poor insight and judgment with respect to her psychological needs and with her ability to attend to the needs of Diana. Dr. Morcos recommended individual psychotherapy for Kelly, medication management, parenting training, and continued monitoring by the Division.

In 2016, Diana reported that Kelly had a boyfriend and that Kelly locked Diana in her room when the boyfriend was at their residence. A Division worker visited Kelly's home, and found little food and unsanitary conditions.

In August 2016, the Division filed for and obtained custody of Diana. Shortly thereafter, the Division referred Kelly to Legacy Treatment Services, but Kelly refused to comply with that service. In November 2016, Kelly appeared for a court-ordered psychological evaluation by Larry N. Seidman, Ph.D. Dr. Seidman noted that Kelly had a "strong tendency to go off on psychotic-like tangents." He recommended that Kelly receive further psychiatric evaluation and individual psychotherapy.

Kelly was not fully complying with the recommended services. In particular, she denied having mental health issues, except for depression and PTSD. In contrast, the therapist who treated Kelly reported that she "continues to be unpredictable as far as her mental state and often comes to sessions with scattered and unorganized thought patterns."

In 2016, Kelly also became homeless. Thereafter, Kelly had difficulty maintaining a stable home despite assistance. Kelly also was not fully compliant with the various treatments and services that were provided to her.

A-1054-18T2

Meanwhile, Diana had been placed with a resource family and she was doing well in that placement. During that time, the Division assessed several of Kelly's relatives for placement, but two relatives stated that they were not in a position to take custody of Diana and the Division ruled out the other relatives.

The guardianship trial took place in September and October 2018. At trial, the Division called two witnesses: a Division worker and an expert, Alan J. Lee, Psy.D., a psychologist who had performed a psychological evaluation on Kelly and bonding evaluations. The Division also submitted numerous documents into evidence. Kelly elected not to testify and she did not present any witnesses.

Dr. Lee was qualified as an expert in the field of psychology. He testified that Kelly reported to him that she had been diagnosed with schizophrenia spectrum disorder, but Kelly also reported that she did not agree with that diagnosis. Kelly also told Dr. Lee that in 2004, she had been in a psychiatric hospital, and she reported being on psychotropic medications in the past.

Dr. Lee diagnosed Kelly with schizoaffective disorder and explained that that disorder was a "severe mental illness" that required treatment, including medication. Furthermore, Dr. Lee opined that Kelly would not be able to safely parent Diana now or in the foreseeable future. Dr. Lee also opined that Kelly would not be able to meet Diana's emotional and psychological needs.

Dr. Lee also performed bonding evaluations. He concluded that Diana had an insecure attachment with Kelly. In contrast, Dr. Lee reported that Diana had "formed a significant and positive psychological attachment and bond with each of [her] resource parents[.]"

In his written opinion, Judge Forrest found Dr. Lee and the Division worker to be credible. Judge Forrest then made detailed findings of facts, reviewed the applicable law, and made conclusions of law based on the facts that he found.

With regard to prong one, Judge Forrest found by clear and convincing evidence that Kelly posed a risk to Diana's safety, health, and development because she could not provide a stable and appropriate environment for Diana. In that regard, the judge found that Kelly was unwilling to comply with the mental health services that were necessary for her to provide Diana with a safe and stable home. The judge noted that Kelly consistently denied having any serious mental health issues, refused to comply with recommended treatments, and did not take her medication consistently. Thus, Judge Forrest found that Kelly's conduct harmed Diana and placed Diana at risk of future harm.

Concerning prong two, Judge Forrest found that Kelly was unwilling or unable to eliminate the harm facing Diana and unwilling to or unable to provide

a safe and stable home for Diana. The judge placed particular emphasis on the need for a permanent placement for Diana.

Turning to prong three, Judge Forrest found clear and convincing evidence that the Division had made reasonable efforts to place the child with appropriate caregivers and to provide services to Kelly geared towards her reunification with Diana. The judge noted that Kelly had been provided with weekly-supervised visitation, psychological and bonding evaluations, psychiatric evaluations, parenting class, individual counseling, medication monitoring, and housing assistance.

Finally, with regard to prong four, Judge Forrest found clear and convincing evidence that termination of Kelly's parental rights would not do more harm than good. In making that finding, the judge relied on the unrebutted testimony of Dr. Lee, and noted that the doctor's testimony was supported by the various psychological evaluations of Kelly and Dr. Lee's bonding evaluations.

On this appeal, Kelly argues that the trial court erred in finding prongs two, three, and four of the best-interests test. While acknowledging that she was inconsistent in compliance with certain services, Kelly argues that she undertook significant efforts to place herself in a position where she could care for Diana. Kelly also argues that the Division unduly delayed identifying Kelly's sister as

a placement option and, as a result, the Division inadequately investigated and assessed the sister as a family placement option. Finally, Kelly contends that the testimony and opinions of Dr. Lee were unreliable and, in particular, his bonding evaluations were flawed.

Having reviewed the substantial record in this matter, we reject Kelly's arguments. Each of Judge Forrest's findings concerning the four prongs is supported by substantial, credible evidence. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)). Moreover, Judge Forrest correctly summarized the law and correctly applied his factual findings to the law. N.J. Div. of Child Prot. & Permanency v. P.O., 456 N.J. Super. 399, 407 (App. Div. 2018). Judge Forrest appropriately relied on, among other things, the unrebutted testimony of Dr. Lee who had conducted a number of evaluations and had a factual basis for his opinions. In that regard, our Supreme Court has noted: "In a termination of parental rights trial, the evidence often takes the form of expert opinion testimony by psychiatrists, psychologists, and other mental health professionals." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 146 (2018).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1054-18T2